E-FILED
Tuesday, 06 November, 2012 12:53:54 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Fred Guyton, Jr., | ) | |
|       Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 10-4060 |
| | ) | |
| David G. Mitchell, | ) | |
|       Defendant | ) | |

**ORDER and OPINION**

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the Court are the Defendant's motion for partial summary judgment (#44) and the Plaintiff's motion for partial summary judgment (#46). These motions are fully briefed, and I have carefully considered the arguments and evidence submitted by the parties. As explained herein, the Plaintiff's motion is denied, and the Defendant's motion is granted in part and denied in part.

Plaintiff has also filed a motion for leave to supplement his memorandum (#48), a motion for leave to file an amended memorandum (#50), and a motion for leave to file plaintiff's declaration (#51). Defendant has filed no opposition to these motions. They are GRANTED. See Local Rule 7.1A. Finally, in light of this Order and Opinion, Plaintiff's motion for oral argument (#49) is DENIED AS MOOT.

I. JURISDICTION AND VENUE

Plaintiff Fred F. Guyton, Jr., is a citizen of Missouri. Defendant David G. Mitchell is a citizen of Illinois. The amount in controversy exceeds $75,000. This Court has jurisdiction over the subject matter of this dispute pursuant to 28 USC 1332(a).

Defendant resides within the Central District of Illinois, and a substantial number of the underlying events occurred within this District. Venue, which is not disputed, is proper in this District.

## II. STATEMENT OF FACTS

The following statement of facts is taken from the parties' motions, the responses and replies thereto, and the evidence submitted in support thereof.

Plaintiff Fred F. Guyton, Jr., ("Guyton") is an architect and planner who is chairman *emeritus* of Peckham Guyton Albers & Viets, Inc., an architectural and planning firm. He lives in St. Louis, Missouri. Defendant David G. Mitchell does business as Mitchell Motorcars International Ltd. or Mitchell Motors, in Geneseo, Illinois, which is also where Mitchell resides. The individual and the business are referred to cumulatively herein as "Mitchell." Mitchell has been in the business of restoring vintage vehicles since 1989.

Guyton owns 54 classic automobiles, many of which he has had restored over the years. One of his cars is a 1932 Nash. In early 2005, Guyton asked Mitchell if he was interested in restoring the Nash; Mitchell responded affirmatively. Guyton asked him to take the vehicle apart to see what would be needed to restore it. In May of 2005, Mitchell sent a written estimate for $127-825 - $130,325, broken down as follows:

| | |
|---|---|
| 53 weeks of labor at $1,750 per week | $92,750.00 |
| parts | 7,575.00 |
| paint and materials | 14,000.00 |
| car top and upholstery | 10,000 - 12,500 |

This estimate did not include any costs for the following parts: running board trim side and end caps; parking light lenses; license light lens; cable pulley; left splash pan; piston rings; valves & guides; and firewall insulator (engine side). The weekly labor cost was based on a a three-member

restoration team that would take about 6,360 man hours to complete the restoration. The two men discussed the estimate at length before Guyton authorized Mitchell to proceed with the project. The project was envisioned as restoration of the Nash as a touring or driving car, not as a car to be entered into a classic car show or similar event. The distinction is important, because a car being restored for a car show requires much more detailed and intricate restoration than does the restoration of a car that will be used as a touring or driving car.

At some point between November 2005 and February 2006, Guyton told Mitchell that he intended to show the restored Nash at the annual car show in Hershey, Pennsylvania. The parties agree that Mitchell did not have the car ready for the Hershey show in 2006, or in 2007, or even in 2008. Nonetheless, Guyton continued to allow Mitchell to work on the car. Mitchell never provided a new written estimate for the overall restoration, nor did he furnish Guyton with written estimates for any specific additional tasks. The parties dispute the nature of the communications between them about the additional work and the attendant costs necessitated by this change. Mitchell asserts that he had "ongoing communication" with Guyton concerning the additional work and the increased costs, and that he kept Guyton "fully advised" as the work progressed by sending him reports and thousands of photographs. Guyton denies these assertions

By the fall of 2008, Guyton's patience was wearing thin. Even Mitchell acknowledged that the car should have been completed, although he claimed to be working hard on it every day. Despite this, when Guyton decided in 2009 to show the Nash at the August 2010 Pebble Beach Concours d'Elegance show rather than the fall 2009 Hershey event, he advised Mitchell of his decision and continued to let Mitchell work on the car. Mitchell hired Upholstery Unlimited to perform upholstery work, committing to deliver the Nash to the upholsterer by late August or early

September 2009. Sometime in October, Mitchell informed Guyton that the Nash had not yet been sent to the upholsterer.

Near the end of November 2009, Guyton received the application for the 2010 Pebble Beach show. He called Mitchell to obtain his assurance that the car would be ready for that event; Mitchell responded "no problem." Guyton then inquired about delivering the car to the upholsterer, and Mitchell responded that delivery would occur right after Christmas. Guyton added that he considered the application to Pebble Beach to be a binding agreement, and Mitchell said he understood.

Mitchell delivered the Nash to the upholsterer in March of 2010. He told Guyton the upholstery work was underway. In April, Mitchell reported that the upholstery was about 1/3 complete but that he would not be available to discuss the subject any more at that time because he was pre-occupied with buying a radio for the car. Guyton was unable to reach Mitchell, so he called the upholsterer and spoke to Steve Pearson, who told him that no work on the Nash upholstery had commenced and that he did not plan to start the work for a couple of weeks. He also reported that it would take 5-6 weeks to complete that work.

At that point, Guyton states that he became "deeply concerned" that the Nash restoration would not be complete in time for the show, so he hired D&D Restoration to complete the project. In late April 2010, movers hired by Guyton picked up the Nash and some parts. D&D completed the restoration.

Throughout the time that Mitchell had possession of the Nash, he continued to send Guyton invoices for his ongoing work, and Guyton continued to pay those invoices, even as the invoiced amounts ran well beyond the original estimate. The invoices paid by Guyton to Mitchell totaled $320,841.88. These amounts included 13,950 to 16,500 hours of labor. The invoices were not

supported by individual work tickets or work orders. The final invoice - for some $55,000 - remains unpaid.

### III. THE PLEADINGS AND MOTIONS FOR SUMMARY JUDGMENT

Plaintiff's First Amended Complaint (#21) consists of eleven counts, as follows: Counts I and II allege violations of the Illinois Consumer Fraud Act. Counts III and IV are fraud claims. Count V alleges a claim for Money Had and Received. Count VI is a common law breach of contract claim. Counts VII and VIII are claims for conversion. Count IX seeks a declaratory judgment. Count X alleges violations of the Illinois Automotive Repair Act, and Count XI asserts promissory estoppel. Generally speaking, what Guyton seeks is reimbursement of the funds he spent in excess of the original estimate, compensatory damages for breach of contract, punitive damages, and attorney's fees.

The Defendant's motion for summary judgment deals only with Counts V, X and XI. .As to those three Counts, in his Answer Defendant has denied all pertinent factual allegations. Defendant "demands judgment in bar of Plaintiff's claim" in Count V.  As to Count X, Defendant adds to his denials "by way of separate or affirmative defense" that monetary damages are not recoverable under the Illinois Automotive Repair Act but only under the Illinois Consumer Fraud and Deceptive Business Practices Act, which requires a "knowing" violation. Because no such violation is plead, "defendant demands judgment in bar of plaintiff's action" in Count X. In answer to Count XI, Defendant denies the material allegations and adds "by way of separate or affirmative defense" that "delay in completing the restoration project was due to the plaintiff's failure to communicate, the giving of conflicting instructions by the plaintiff and other matters beyond the defendant's control." Once again, judgement is demanded in bar of plaintiff's action in Count XI.

Defendant's motion for summary judgment raises 3 purely legal questions: (1) can a private right of action be implied from the Illinois Automotive Repair Act? (2) can a claim for money had and received be maintained when there is a contract between the parties? and (3) can a claim for promissory estoppel be maintained when there is a contract between the parties?

Plaintiff's amended motion for partial summary judgment deals with Counts IX and X. Plaintiff asserts that, as to Count X, Mitchell's billing for amounts in excess of the estimated amount was a violation of the IARA, and he is entitled to all amounts in excess of that estimated amount. As to Count IX, Guyton argues that he is entitled to a declaration that Mitchell's mechanic's lien is invalid as against the Nash or any parts thereto.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS V, X AND XI

A. Count V: Money Had & Received

Under Illinois law, "[a]n action for money had and received is maintainable where defendant has received money which in equity and good conscience belongs to the plaintiff." *Maloney v. Pihera,* 215 Ill App 3d 30, 45, 158 Ill Dec. 194, 573 NE2d 1379 (1991), cited in *Kaiser v. Fleming*, 735 NE2d 144, 147 (Ill App 2000). This cause of action seeks to recover money "either under the theory of an implied contract or under the theory of a quasi contractual obligation." Id, quoting *Beatrice Foods Co. v. Gallagher*, 197 NE2d 274 (1964). In *Maloney,* for example, the plaintiff contributed funds towards a partnership with defendant that never materialized. In *Kaiser*, the plaintiff paid off the defendant's mortgage, receiving a promise of repayment when the property was sold. In both cases, a cause of action for money had and received was found to have been sufficiently plead.

Defendant asserts that this equitable cause of action, like any other equitable cause of action, cannot be maintained between parties to an express contract. As one Illinois Court has explained, quasi-contractual claims ordinarily arise when there is no contract, either express or implied, between the parties. *Industrial Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp*, 432 NE2d 999, 1002 (Ill App 1982). The facts from which quasi contractual actions usually stem involve a party who has performed a service that has benefitted another. While the benefitting party did not request the service, the benefit has been accepted, and the circumstances indicate that the services were not intended to be gratuitous. The law will then impose a duty on the benefitting party to pay for the services rendered, despite the lack of a contract. Id. See also, *Hamilton v. American Gage & Machine Corp*, 342 NE2d 758 (Ill App 1976).

The *Industrial Lift Truck* Court went on to explain that problems arise when a party to an express contract attempts to assert a quasi-contractual claim against the other contracting party. "The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests." 432 NE2d at 1002, citing *La Throp v. Bell Federal Savings & Loan Association* (1977), 370 NE2d 188 (Ill 1977), cert. denied, 436 U.S. 925 (1978); *Goodman v. Motor Products Corp*, 161 NE2d 31.(Ill App 1959). The Court continued:

> The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow. Quasi-contract is not a means for shifting a risk one has assumed under contract.

*Industrial Lift Truck*, 432 NE2d at 1002 [citations omitted].

Compare *Appert v. Morgan Stanley Dean Witter, Inc*, 673 F.3d 609, 625 (7th Cir. 2012),

where the Court rejected a claim based on another quasi-contractual theory, unjust enrichment, because of the existence of a contract between the parties. The Seventh Circuit stated: "The existence of a valid and enforceable written contract ... ordinarily precludes recovery in quasi contract ... for events arising out of the same subject matter." Id, quoting *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 964 (2d Cir.1998) (applying New York law); and citing *Clark–Fitzpatrick, Inc. v. Long Island R.R.*, 516 NE 2d 190 (NY 1987).

Plaintiff relies on Allen v. Stenger, 1874 WL 9087 (Ill 1874) for the general proposition that a claim for money had and received lies when "one person obtains the money of another which it is inequitable or unjust for him to retain." Id. That is true, but it is not a response to Defendant's argument. Case law makes it plain that, even if those circumstances exist, if there is also a contract between the parties, the action does *not* lie.

Ordinarily, the proper response to Defendant's argument would be that federal law allows pleading in the alternative, even if the claims are not consistent. FRCP 8(d)(3). A jury could be instructed, for example, that if they were to find the existence of a contract between the parties, they must enter judgment in favor of the defendant on this claim; and if they were to find no valid and enforceable contract between the parties, they could consider whether plaintiff has proved this claim. The mere fact that the two claims were inconsistent would not be a basis, without more, for dismissing either claim.

Defendant asserts that the parties do not dispute the existence of a contract. This is not precisely correct. Both parties agree that Guyton asked Mitchell to provide an estimate for restoring the Nash to touring car level and that he did so. Beyond that, there is not much agreement. So while there may have been a contract to the extent of restoration to touring car level, whether the contract

extended to the additional work performed is disputed, the terms of any such contract are disputed, and performance under any such agreement is disputed. It will be up to a jury to decide whether an enforceable contract existed and, if so, what the terms were and whether it was breached.

In light of the factual disputes that surround the breach of contract claim, I find that the mere existence of a breach of contract claim is not a sufficient basis for entry of judgment as to the quasi-contractual claim contained in Count V. The problems raised by Defendant can be cured with proper jury instructions. Accordingly, the Motion for Summary Judgment as to Count V is DENIED.

B. Count X: Illinois Automotive Repair Act

Section 5 of the Illinois Automotive Repair Act ("IARA") is captioned "Legislative Finding." It reads as follows:

> The automotive repair industry supports good communication between motor vehicle repair facilities and their customers. The General Assembly recognizes that improved communications and accurate representations between automotive repair facilities and their customers will increase consumer confidence, reduce the likelihood of disputes arising, and promote fair and nondeceptive practices, thereby enhancing the safety and reliability of motor vehicles serviced by motor vehicle repair facilities in the State of Illinois.

815 ILCS §306/5.

In order to implement these findings, the IARA sets out requirements for automotive repair facilities, such as mandating certain consumer disclosures and requiring written estimates. Enforcement of these requirements is effected by deeming any "knowing[ ] ... persistent practice or pattern" of violations by automotive repair facilities to be unlawful acts or practices under the Consumer Fraud and Deceptive Business Practices Act.   815 ILCS 306/85. In the face of such violations, "all remedies, penalties, and authority available to the Attorney General and the several State's Attorneys under the Consumer Fraud and Deceptive Business Practices Act for the enforcement of that Act shall be available for the enforcement of this Act." Id.

The parties agree that the IARA contains no explicit private cause of action. Defendant asserts that no such action can be inferred from the Act, while Plaintiff asserts that Illinois would permit inference of such a right.

The controlling legal principles for implication of a private right of action are long established. The Illinois Supreme Court has articulated four factors which must be shown by a plaintiff in order to permit a private cause of action to be implied from a statute. These factors are:

1. The plaintiff must be a member of the class for whose benefit the statute was enacted.
2. The plaintiff's injury is one the statute was designed to prevent.
3. A private cause of action is consistent with the underlying purpose of the statute, and
4. Implying the private right of action is necessary to provide an adequate remedy for violation of the statute.

*Fisher v. Lexington Health Care, Inc*, 722 NE2d 1115 (Ill1999), citing *Rodgers v. St. Mary's Hospital*, 597 NE2d 616 (Ill 1992) and *Corgan v. Muehling*, 574 NE2d 602 (Ill 1991). See also *Board of Education v. A,C&S, Inc*, 546 NE2d 580 (Ill 1989); *Abbasi v. Parakdevoulakos*, 718 NE2d 181, 186 (Ill 1999); and *Sawyer Realty Group v. Jarvis Corp*, 432 NE2d 849 (Ill 1982).

The States' Supreme Court has also made clear that all four factors need not be analyzed if analysis of the fourth factor leads to only one conclusion, namely that there is an adequate remedy for violation of the statute already contained elsewhere in the law. See, for example, *Abbasi*, 718 NE2d at 186, where the Court's analysis went directly to the fourth factor, finding it unnecessary to imply a private right of action where such an action would be identical to a common law negligence claim.

This Order therefore begins with the all-important, and in this case decisive, fourth factor: is implication of a private right of action necessary to provide Guyton with an adequate remedy for any violation of the statute that Mitchell may have committed? I conclude that, in this case it is not.

Plaintiff has several private rights of action, as is vividly demonstrated by the eight counts of this complaint that are not challenged in the motion to dismiss. He has contractual remedies, tort remedies, and statutory remedies available, including the possibility for recovery of punitive damages. Adding an implied right of action is wholly unnecessary and largely (if not entirely) redundant.

That finding makes it technically unnecessary to consider the other three prongs, but for purposes of complete analysis, I find as follows. As to the first prong, Guyton is certainly a member of the class for whose benefit the statute was enacted. The services for which Guyton contracted with Mitchell were classic consumer services. Classic car collection was his hobby; driving or showing these cars was his goal. The monetary stakes may have been higher than for many hobbies, but a hobby it was. Restoration of the vehicle was for Guyton's own personal enjoyment and use. The mere fact that Guyton was a "knowledgeable" consumer is, for purposes of this statute, not pertinent; the IARA does not make that distinction. There is nothing about this situation that takes Guyton, who was clearly Mitchell's "customer," outside the meaning of "consumer."

This conclusion is consistent with statutory definition of "consumer" found in the Consumer Fraud and Deceptive Business Practices Act." 815 ILCS 306/85 ("CFA"). The CFA defines "consumer" as follows:

> (e) The term "consumer" means any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household.

815 ILCS §505/1(e). Guyton's purchase of Mitchell's services was for his own personal use and not for use in a trade or business. This consistency is important because the CFA provides the enforcement mechanism of the IARA. All the IARA does is add to the list of violations that trigger

the enforcement scheme of the CFA. Nowhere does the IARA purport to utilize a different definition than does the CFA.

As to the second factor, Guyton's injury is one the statute was designed to prevent. While it is disputed between these parties whether Mitchell's "ongoing communication" with Guyton satisfied the requirements of IARA, assume for the sake of argument that the communications fell short. If that should prove to be the case, then the vastly increased cost over the original estimate without adequate written documentation and consent is exactly the type of injury the IARA is meant to prevent.

The third prong is concerned with the underlying purpose of the statute. It is evident from the "Legislative Findings" quoted above that the legislature sought to create a balance between the needs of consumers and those of repair facilities by putting into place requirements designed to improve communications between them. Rather than creating a remedy for every dissatisfied consumer, however, the legislature limited its concerns to facilities that routinely engaged in practices that harmed consumers. Hence the focus on "patterns" and "knowledge." Hence, too, the limited mode of enforcement. Implication of a private right of action by individual consumers would be inconsistent with the expressed findings and with the statutory scheme.

In this case, the State's legislature clearly considered remedies when it enacted this statute. It tied a violation of the substantive portions of the statute to the Consumer Fraud Act, making certain of those violations enforceable not by private citizens but by prosecutors and the Attorney General. If the legislature had intended to create a private right of action, one would have been included, either in the IARA itself or in the reference to the Consumer Fraud Act which itself

contains a private right of action. Implying a private right of action under this circumstance would be inconsistent with the language and the structure of the IARA.

The case of *Fandel v. Allen*, 937 NE2d 1124 (3d Dist 2010) is instructive. The Illinois Court of Appeals for the Third District considered whether a private right of action could be inferred from the Illinois Home Repair and Remodeling Act[1] (HRRA). The plaintiff was a roofing contractor suing to enforce a mechanic's lien; the home-owner defendant defended on the basis that he did not receive a consumer rights brochure and did not sign the work order, both requirements of the HRRA. The Court of Appeals held that the defenses were not available in private litigation, noting that the purpose of the HRRA was:

> to empower the Attorney General and the State's Attorney to correct a potential harmful practice, not to deny an honest and competent workman the fair value of his work nor to give a homeowner a valuable benefit without paying for it.

I believe that the provisions of the IARA, like the HRRA at issue in *Fandel*, were designed to be used as a shield, not as a sword. The intent was to protect consumers against unscrupulous repair facilities, not to give them a cause of action against those facilities. I therefore conclude that there is no private right of action, express or implied, in the IARA. The Motion for Summary Judgment as to Count X is therefore GRANTED.

C. Count XI: Promissory Estoppel

Mitchell asserts that, once it is established that there is an enforceable contract between the parties, the theory of promissory estoppel is no longer available, citing *Prentice v. UDC Advisory Services, Inc*, 648 NE2d 146 (Ill App1995). "Promissory estoppel is a method to enforce promises that do not meet the requirements of consideration. It is not intended to give a party to a negotiated

---

[1] 815 ILCS 513/1 et seq.

commercial bargain a second bite at the apple in the event it fails to prove breach of contract." Id. at 150-51.

The Court in *Prentice* rejected the argument that no plaintiff can simultaneously *plead* and pursue alternative claims based on breach of contract and promissory estoppel. Once, however, it is "established, either by an admission of a party or by a judicial finding" that an enforceable contract - and hence consideration - exists, then the theory of promissory estoppel is no longer available. Id at 151.

As noted in part A above, however, it is not "established" that there existed an enforceable contract that encompasses the entire scope of the relationship between these parties. The Court has not made that finding, nor has Mitchell pointed the Court to any definitive admission by Guyton (beyond the existence of the claim for breach of contract, which as noted is not definitive or dispositive here). Accordingly, the motion for summary judgment as to Count XI is DENIED.

## V. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

A. Count X: Illinois Automotive Repair Act

As explained in part IV. B. above, no private right of action exists under the IARA. Hence, this part of Plaintiff's motion has no merit and must be DENIED.

B. Count IX: Declaratory Judgment

In this Count of his complaint, Guyton alleges that Mitchell has recorded a chattel lien against the Nash, based on Illinois law. 770 ILCS 45/1 et seq. He seeks a declaration that the lien is null and void for two reasons. First, he asserts that any violation of a section of IARA voids a mechanics lien. Second, he argues that Mitchell has failed to file a counterclaim for any amount that is due and owing, a necessary prerequisite to a mechanics lien.

Under the IARA, a motor vehicle repair facility that violates one of the statute's proscriptive sections "is barred from asserting a possessory or chattel lien for the amount of the unauthorized parts or labor upon the motor vehicle or component." 815 ILCS 306/75. According to Guyton, Mitchell violated sections 15 and 20 of the IARA, so he is barred from asserting a lien. Section 15 requires either a written estimate that cannot be exceeded by more than 10% without consent of the consumer, or a written price limit for each specific repair that cannot be exceeded without oral ro written consent of the consumer. Section 20 requires that when an estimate is required, a particular notice must also be included regarding the consumer's rights.

The obvious problem with that argument is that there are hotly disputed facts regarding the nature of the communications regarding the repairs that were undertaken after Guyton changed his request for restoration from a touring car to a show car. Whether Mitchell's communications and photographs met the statutory requirements cannot be determined on the record before the Court. This is a question for trial, not summary judgment.

Guyton's second argument is that Mitchell's asserted lien should have been protected not only by recording it as Illinois law requires but also by asserting it as a compulsory counterclaim in this litigation as FRCP 13(a) requires. Rule 13(a) mandates that a party state as a counterclaim "any claim that ... the pleader has against an opposing party" if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."[2]

Mitchell does not dispute that the claim should have been plead as a counterclaim. He asserts first, however, that the substance of his Answer along with the discovery that has been

---

[2] The second part of this provision is that the claim would not require adding a party over whom the court lacks personal jurisdiction, an issue not presented here.

undertaken should be construed as a counterclaim. Specifically, he points to his answer to this Count, wherein he denies the substantive allegations and, in his Wherefore clause, asks the court to deny the declaratory relief sought and uphold the validity of the lien in the amount of the unpaid invoice ($57,498.89) plus interest and costs. He also asserts that discovery was completed "with that issue on the table."

Plaintiff relies on *Renner Motors Inc v. Ford Motor Co*, 2005 WL 1396992 (SD Ind 2005). In that case, the issue was whether Ford had a duty to defend and indemnify Renner in a wrongful death action. Renner sought a declaration that such duties existed; Ford did not plead a counterclaim but simply denied the allegations and requested that the court declare that it had no duty to defend or indemnify. In considering whether Renner could voluntarily dismiss the action, Ford asserted that it had, in essence, plead a counterclaim, an assertion that the court rejected. Seeking such relief in the prayer, said the court, "triggered no obligation ... to file a responsive pleading and no corresponding burden of proof attached..." Id at *1.

In *Renner*, the court was faced with an entirely different question than the one now before this Court. The issue before the *Renner* court was procedural, not substantive, namely whether the pleading of a counterclaim allowed prohibited the plaintiff from taking a voluntary dismissal. Because no counterclaim had been plead, voluntary dismissal - without leave of court - was prohibited by rule.

The *Renner* court's language about the necessity of pleading a counter-claim must be taken in that context. The court made no pretext of deciding any substantive question. Hence, *Renner* is of no assistance in determining the substantive question that Guyton has placed before this Court, namely whether to declare that Mitchell's lien is invalid, as Guyton has requested. The burden of

proving to the Court's satisfaction that the lien is invalid rests, of course, with Guyton, who relies on his assertion that Mitchell violated sections 15 and 25 of the IARA. As discussed above, however, there are factual disputes about whether Mitchell's conduct did violate the IARA, disputes that cannot be resolved on paper but must await trial.

There is yet another reason that the question whether Mitchell's failure to file a counterclaim as to his lien bars enforcement of that lien. If Guyton is successful in establishing a basis for finding the lien invalid, that Mitchell will be bound by that finding; he will not get a second bite at the apple by filing a state court action to enforce the lien. Likewise, if Guyton is unsuccessful in establishing a basis for finding the lien invalid, then the issue of whether this is a compulsory counterclaim and, if so, the effect of not pleading it, will be properly before the court. Until then, any ruling on this question would by premature.

Accordingly, Guyton's motion for summary judgment as to Count IX is denied.

## VI. CONCLUSION

Defendant's motion for summary judgment is granted as to Count X and denied as to Counts V and XI. Plaintiff's motion for summary judgment is denied in its entirety. This case remains set for a final pretrial conference on Dec. 7, 2012 at 1:30 pm in person in Peoria. An agreed Proposed Final Pretrial Order and any motions in limine shall be filed on or before Nov. 26, 2012.

ENTER this 6th day of November, 2012.

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE